Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Jay Edelson*
jedelson@edelson.com
Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin S. Thomassen*
bthomassen@edelson.com
Amir Missaghi*
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*_Pro hac vice_ admission to be sought.

_Attorneys for Plaintiff and the Putative Class_

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS LADORE, individually and on behalf of all others similarly situated,<br><br>_Plaintiff,_<br><br>v.<br><br>SONY COMPUTER ENTERTAINMENT AMERICA, LLC, a Delaware limited liability company,<br><br>_Defendant._ | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. **Violations of Cal. Civ. Code §§ 1750, _et seq._;**<br>2. **Violations of Cal. Bus. & Prof. Code §§ 17200, _et seq._;**<br>3. **Violations of Cal. Bus. & Prof. Code §§ 17500, _et seq._;**<br>4. **Breach of Express Warranties;**<br>5. **Fraud in the Inducement;**<br>6. **Negligent Misrepresentation; and**<br>7. **Unjust Enrichment**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Douglas Ladore ("Plaintiff" or "Ladore") brings this class action complaint ("Complaint") against Defendant Sony Computer Entertainment America, LLC ("Sony" or "Defendant") based on the deceptive marketing of its Killzone: Shadow Fall video game ("Killzone") for the PlayStation 4 video game console. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.      In late 2013, Sony unveiled its latest video game console—the much-awaited PlayStation 4 ("PS4"). As part of its campaign to promote the PS4, Sony sought to show gamers— and the world—the technological capabilities of its new console. And to accomplish this goal, Sony elected to market Killzone as the PS4's headlining video game.

2.      According to Sony, Killzone was a graphically striking game set in a dystopian future that took full advantage of the PS4's advanced processing power. Sony claimed that the PS4 was so powerful that its featured Killzone video game could display "1080p"[1] multiplayer graphics, a crowning achievement in the video game industry.

3.      However, after the game's release, gamers quickly noticed and complained that Killzone's multiplayer graphics were blurry to the point of distraction. The cause of this blurriness went unknown until a well-respected video game website reported that Killzone's multiplayer did not actually provide "1080p" graphics as advertised.

4.      Following this discovery, Sony released an official statement on the matter. In it, Sony admitted that it did not in fact design Killzone to display multiplayer graphics in 1080p, but instead used a technological shortcut that was supposed to provide "subjectively similar" results.

5.      But Sony never advertised and convinced consumers to buy a technological shortcut. Instead, through Killzone's pre- and post-release marketing campaign, Sony advertised—and caused dozens of websites, gaming blogs, and industry articles to report—that Killzone would

---

[1]      As explained more fully below, "1080p" refers to an industry-standard graphical resolution of 1,920 vertical lines of pixels by 1,080 horizontal lines of pixels with progressive scanning.

provide unprecedented "native 1080p" multiplayer graphics. What's more, Sony's marketing culminated in on-the-box representations that Killzone would provide 1080p multiplayer graphics. None of these promises were true.

6.     Accordingly, this putative class action lawsuit seeks (i) to prevent Defendant from continuing to misrepresent Killzone's technological specifications and performance capabilities, and (ii) damages for those deceived into purchasing the video game under false pretenses.

## JURISDICTION AND VENUE

7.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than the Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

8.     This Court has personal jurisdiction over Defendant because it conducts business in California and because the events giving rise to this lawsuit occurred, in substantial part, in California.

9.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District. Venue is additionally proper because Defendant maintains its headquarters and principal place of business in this District.

## PARTIES

10.     Plaintiff Douglas Ladore is a natural person and citizen of the State of California.

11.     Defendant Sony Computer Entertainment America, LLC, is a limited liability company organized in and existing under the laws of the State of Delaware with its principal place of business located at 919 East Hillsdale Boulevard, Foster City, California 94404. Sony does business throughout the United States, the State of California, and this District.

## FACTUAL BACKGROUND

### I.     A Brief Introduction to Sony and Killzone: Shadow Fall.

12.     Sony Computer Entertainment America was founded in 1994 and has become a household name in consumer gaming technology. Sony Computer Entertainment America is a

wholly owned subsidiary of non-party Sony Corporation of America, Inc., and its California offices serve as the headquarters for all of its parent's North American operations, including the sale and marketing of Sony's video game software and hardware generally, and the Killzone video game in particular.

13.     In 1995, Sony launched the first in its PlayStation line of video game consoles. More recently, on November 15, 2013, Sony released its PlayStation 4. To demonstrate the performance of the PS4, Sony chose to simultaneously release the Killzone: Shadow Fall video game developed by Sony's video game development division, Guerrilla Games ("Guerrilla").[2]

14.     The success of Killzone was imperative to Sony and the ultimate success of the PS4—only days after the PS4's release, Microsoft planned to release its Xbox One. Microsoft stands as Sony's main competitor in the gaming industry, and the release of the Xbox One triggered a "console war," with both companies vying for consumer purchases.

15.     Because Killzone was one of the few game titles available *exclusively* for the PS4 on the console's retail release date (i.e., gamers could not purchase Killzone for the Xbox One), Sony held it out both as a showcase for the PS4's technical capabilities and a prime reason to purchase the console.

16.     All marketing and advertisements for the Killzone video game were developed by Sony and emanated from Sony's California offices.

## II.     The PlayStation 4 and Xbox One Battle for the Next Generation of Gaming.

17.     Sony and Microsoft have battled for video gamers' attention for more than a decade. And all signs indicated that the "next generation of gaming" (marked by the release of the PS4 and the Xbox One) would continue that trend. As one popular technology website put it, "[t]he war for dominance over the eighth console generation will soon be on . . . Xbox One and PlayStation 4 will

---

[2]     For all intents and purposes related to Killzone: Shadow Fall, Guerrilla is and has been controlled and directed by Sony.

hit store shelves, unleashing what will surely be a hotly contested battle between the firms."[3]

18.     Naturally, the focus of the "console battle" rested squarely on the consoles' respective performance. Amongst gamers and video game critics, a metric known in the industry as "resolution" is a leading indicator of video game and console performance.

>    *i.     A brief discussion of resolution.*

19.     "Resolution" is as a measure of a digital image's clarity. A digital image is composed of many points of color (i.e., pixels), with more pixels generally corresponding to increased clarity. Image "resolution" refers to the number of lines of pixels in the vertical direction by the number of lines of pixels in the horizontal direction (e.g., 1,920 by 1,080).[4]

20.     By far, most modern televisions use the industry-standard "1080p" format.[5] Under that standard, the "1080" refers to the number of lines of pixels in the horizontal direction (1,920 by 1,080). The "p" in "1080p" refers to the standard's "progressive scanning" technology.[6] With progressive scanning, the television uses all of the pixels on the television for each frame (i.e., image).

>    *ii.     In the Gaming Industry, Resolution is Used to Compare the PS4 to the Xbox One.*

21.     Publishers and developers like Sony have long used resolution metrics to compare (and tout) video game and console performance. Even before a video game is complete, publishers

---

[3]     *Sony's PlayStation 4 Will Win This Console Generation – SlashGear*, http://www.slashgear.com/sonys-playstation-4-will-win-this-console-generation-04300290/ (last visited July 14, 2014).

[4]     7 *Lindey on Entertainment*, Publ. & the Arts § 19:107 (3d ed.).

[5]     *ATSC Digital Television Standard: Part 4 – MPEG-2 Video System Characteristics*, http://www.atsc.org/cms/standards/a53/a_53-Part-4-2009.pdf (last visited July 29, 2014).

[6]     The "p" is meant to distinguish the 1080p from the alternative 1080i format that utilizes "interlace" scanning. With interlace scanning, the television displays half the number of horizontal lines of pixels for one frame and then displays the other half of the horizontal lines of pixels for the next frame. Thus, for any single frame rendered on the 1080i format, the effective resolution (i.e., the number of lines of pixels actually displayed on the television) is 1,920 by 540, not 1,920 by 1,080. With 1080p's progressive scanning, on the other hand, the television renders (i.e., displays) all 1,920 lines of vertical pixels and all 1,080 lines of horizontal pixels.

---

1    and developers release resolution specifications to the media in order to build interest for their

2    games.

3          22.    Before the release of the Xbox One and the PS4, for instance, TechRadar, a video

4    game news website, used a game's resolution to compare the performance of a video game that was

5    to be released for both consoles. It found that the game rendered a resolution of "1080p on the PS4

6    but only 720p on the Xbox One. For clarity, that's 1,920 by 1,080 pixels versus 1,280 by 720

7    pixels. Put another way, that's two million pixels on the PS4 [i.e., 1,920 multiplied by 1,080], just

8    one million on the Xbox One. Quite literally, the PS4 will offer double the graphical detail."[7]

9          23.    TechRadar explains that the "the PS4 is more powerful in graphics terms. And that

10   means the PS4 can render higher detail graphics . . ." To make up for the Xbox One's apparent

11   performance shortcoming, TechRadar states that many Xbox One game developers will resort to

12   "interpolation," also known as "upscaling."[8] The use of interpolation, as TechRadar puts it, results

13   in "a horrible kludge that results in soft, slightly blurry images."

14         24.    While TechRadar documented the interpolation and upscaling that Xbox One games

15   used to approximate the standard 1080p benchmark (i.e., as a major drawback from the Xbox One

16   console, as compared to the PS4), Sony elected to secretly utilize interpolation to make up for the

17   graphics deficiencies of its massively important PS4 launch title, Killzone: Shadow Fall.

18   **III.    Sony Hypes the Performance of Killzone to Convince Gamers That the PS4 is
     Superior to its Competitors' Consoles.**

19         25.    As introduced above, Sony chose to feature Killzone when it launched the

20   PlayStation 4, ostensibly because of its graphical fidelity. In doing so, Sony widely promoted

21   Killzone's purportedly advanced "single player" and "multiplayer" graphics.

22         26.    Contemporary video games often contain two different gameplay modes: single

23

24   [7]    *PS4 vs Xbox One graphics: what are the differences and do they matter? | News |
     TechRadar*, http://www.techradar.com/us/news/gaming/consoles/ps4-vs-xbox-one-graphics-what-
25   are-the-differences-and-do-they-matter--1195580 (last visited July 14, 2014).

26   [8]    Interpolation is the common name for methods that attempt to fill in blank pixels that are
27   created when an image is transformed from a lower resolution to a higher resolution. Interpolation
     methods use algorithms to guess what the blank pixels should look like by analyzing nearby pixels.

28

player and multiplayer. Single player refers to a video game mode in which only one gamer interacts with the game at a time. In single player mode, a gamer typically plays through a video game's storyline, which seldom requires an Internet connection.

27.     Today, "multiplayer" modes allow gamers to play and interact with other gamers across the Internet. As such, and because multiplayer game sessions will network several participants across the Internet, multiplayer modes add complexity to any video game and require greater processing power. This typically means that multiplayer graphics—including the resolution used for multiplayer game modes—have lagged behind single player graphics.

28.     For the marketing of the PS4 and the much-anticipated Killzone video game, however, Sony promised that Killzone's multiplayer graphics had finally bridged the gap. Specifically, in early 2013—months before the game was publicly released—Sony began advertising that Killzone's multiplayer would offer the same graphical fidelity as the game's single player mode.[9] For instance, through its PlayStation.com website, Sony confirmed that Killzone's multiplayer "runs at native 1080p and 60 fps [i.e., frames per second]."[10]

29.     In promising such graphical fidelity, Sony knew exactly how important resolution is to gamers, and specifically designed its advertisements to appeal to gamers. To that end, Killzone's director told an "official" PlayStation news website that "[t]he first thing that people notice is fidelity … [Killzone] is running in 1080p, whereas the last game was running in 720p – that

---

[9]     *See, e.g. Killzone: Shadow Fall Wiki*, (March 13, 2013), http://gamingbolt.com/killzone-shadow-fall-wiki (last visited July 17, 2014) ("The game has been confirmed to run on 1080p and 30 fps, and will be the first PS4 title which has been found to run at a full HD native resolution").

[10]     *Killzone Shadow Fall - Campaign hands-on, new multiplayer footage*, http://blog.eu.playstation.com/2013/11/02/killzone-shadow-fall-campaign-hands-on-new-multiplayer-footage/ (last visited July 14, 2014). Almost five months after the game's release, however, Sony attempted to qualify this representation: "we learned that the game uses a 'reconstruction technique to combine samples from two 960 x 1080 frames to form a new full 1080p frame . . . [which] render[s] multiple lower-resolution buffers in order to create a 1080p image.'" *Id*. This technique is discussed more fully in Sections IV and V, *infra*.

1    immediately makes a difference."[11]

2           30.    Consistently—and in response to doubts as to whether Killzone would truly deliver a

3    next-generation experience—Sony's Social Media Manager publicly confirmed that "Killzone

4    Shadow Fall's [single player] is a visual stunner on PS4, rendering a smorgasbord of reflections,

5    dynamic lighting, and billowing smoke at a razor-sharp 1080p native resolution (1920 x 1080) . . .

6    *Then there's the competitive multiplayer mode which, like the game's [single player mode], runs at*

7    *native 1080p and 60 fps.*"[12]

8           31.    Sony continued to push the lauded 1080p / 60 fps Killzone multiplayer features

9    leading up to the game's and PS4's retail release. On November 4, 2013—less than two weeks

10   before Killzone's retail release date—Sony released a downloadable gameplay demonstration to

11   tout Killzone's multiplayer graphics, stating:

12          "In order to properly demonstrate the framerate and resolution we achieve in
        Shadow Fall's multiplayer, we've captured and lightly compressed new footage that
13      we're not offering through a video sharing service. Instead, we ask that you
        download and locally view the high-resolution, uncompressed footage directly from
14      from [*sic*] us.

15                          *          *          *

16      As you can probably tell from the footage, Killzone Shadow Fall multiplayer outputs
        at a native 1080p, rendering uncapped but always targeting 60 [frames per second].
17      We're very pleased with how well the game runs, and we can't wait for you to play
        it come November 15th."[13]

18          32.    Following the release of Sony's downloadable gameplay demonstration, dozens of

19   video game and tech-focused websites reported on Killzone's "high-resolution, uncompressed

20

21

22   [11]    *Killzone Shadow Fall - Guerrilla explain how PS4's tech changes the series, & the FPS,*
23   *forever*, http://www.officialplaystationmagazine.co.uk /2013/06/26/killzone-shadow-fall-how-ps4s-
     new-tech-is-changing-the-fps/ (last visited July 14, 2014).

24

25   [12]    *Id.*

26   [13]    *Killzone Shadow Fall: Ultra High Bitrate Multiplayer Footage – PlayStation.Blog*,
     http://blog.us.playstation.com/2013/11/04/killzone-shadow-fall-ultra-high-bitrate-multiplayer-
27   footage/ (last visited July 14, 2014).

28

footer."[14] As one website put it, "[i]f a picture is worth a thousand words, then [Killzone's] trailer in 1080p at 60fps is at least five times as valuable," adding that "Sony isn't the first to [release a downloadable gameplay demonstration] though, it's just the first to heavily publicize it."[15]

33.     Sony's campaign to publicize Killzone's multiplayer graphics worked: before long, gaming websites and industry articles all over the Internet were reporting that Killzone's multiplayer mode would deliver native 1080p graphics.

34.     As a final, consistent, and ubiquitous measure, Sony ensured that the packaging for *every* retail copy of Killzone represented—among the game's other consumer-facing technical specifications—that Killzone's resolution was an unqualified "1080P."



(**Figure 1,** showing a portion of Killzone's retail product packaging.)[16]

---

[14]     *See, e.g., New Killzone PS4 footage is download-only to show off its 1080p, 60 FPS gameplay | Polygon*, http://www.polygon.com/2013/11/4/5066292/killzone-shadow-fall-ps4-footage-1080p-60fps (last visited July 14, 2014) ("*Killzone: Shadow Fall* is rendered at 1080p resolution natively . . . and targets 60 frames per second, details that can be compromised with web video."); *Download Killzone Shadow Fall footage running in 1080p at 60 frames per second - Killzone: Shadow Fall for PS4 News*, http://www.videogamer.com/ps4/killzone_shadow_fall/news/download_killzone_shadow_fall_footage_running_in_1080p_at_60_frames_per_second.html (last visited July 14, 2014 (stating that "developer Guerrilla Games has released a full 1080p and 60 frames per second multiplayer gameplay video with only light compression, presenting the game almost as if you were actually playing it.").

[15]     *PS4 struts its power in download-only Killzone: Shadow Fall trailer*, http://www.engadget.com/2013/11/05/killzone-shadow-fall-trailer-direct-download/ (last visited July 14, 2014).

[16]     A true and accurate reproduction of the Killzone retail packaging is attached hereto as Exhibit A. Figure 1 is an excerpt from that reproduction.

35.     As shown in <u>Figure 1</u>, the Killzone packaging features a series of seven boxes that communicate the game's technical specifications to consumers in a manner that is easy to read and understand.

36.     Similar boxes appear on the external packaging for all (or nearly all) modern video games, including games for the PS4 and Xbox One. Much like other consumer-facing labeling schemes (such as the labeling found on articles of clothing indicating whether a shirt is machine washable or "dry clean only") the standardized icons and descriptors are designed to quickly convey objective information about a game, such as (i) any technical requirements that must be met to play the title (e.g., whether an Internet connection is required to play the game), (ii) any technical limitations on the gameplay (e.g., whether the game supports multiplayer, or is single player only), and (iii) other technical capabilities of the title (e.g., whether the game's graphical output is limited to a low resolution).

37.     For Killzone, the package's technical specifications conveyed seven points:

- **"1 PLAYER"** – offline, the game can only be played in single player mode;

- **"45GB MINIMUM"** – the game can only be played if 45 gigabytes of storage space are available on the user's PS4 console for installation (each standard PS4 is sold with only 500 gigabytes of storage space, which quickly gets used by game installations);

- **"2 – 24 NETWORK PLAYERS"** – the game's multiplayer modes can accommodate between two and twenty-four networked players simultaneously;

- **"ONLINE PLAY (OPTIONAL)"** – the game features online play over the Internet, but online connectivity is not required to play the game;

- **"DUALSHOCK 4"** – the game supports the PS4's "DualShock 4" controller, which was packaged with every standard PS4 console sold to consumers;

- **"1080P HD VIDEO OUTPUT"** – the game outputs at a resolution of 1080P; and

- **"REMOTE PLAY"** – the game supports the PS4's "remote play" feature, which requires other equipment to utilize.

38.     Through the game's consumer-facing technical specifications, and consistent with its overall marketing and advertising campaigns, Sony expressly listed Killzone's resolution at an unqualified "1080P." (*See* Figure 1, emphasized portion.)

39.     This was no accident. Game developers commonly use a standardized icon and descriptor similar to that shown in the emphasized portion of Figure 1. But other developers are generally careful to accurately indicate whether their game's resolution might have limitations, or might not always display at a maximum 1080P resolution. (*See*, *e.g.*, Figure 2, showing the on-box technical specifications for the PS4's Infamous Second Son video game—publicly released on March 21, 2014 and also published by Sony—listing the game's resolution as "480P • 720P • 1080i • 1080P.")



(**Figure 2.**)

40.     Because of the dozens of reports about Killzone's next-generation multiplayer graphics, along with the unqualified "1080P" label on the game's consumer-facing technical specifications, over 2 million consumers purchased Killzone: Shadow Fall. Unfortunately, Sony's marketing and on-box representations turned out to be nothing more than fiction.

## IV.     Complaints of "Blurry" Multiplayer Graphics Reveal That Sony Misled Gamers About Killzone's Graphical Fidelity.

41.     After the game's release, many gamers experienced and complained about Killzone's "blurry" multiplayer graphics. One gamer recognized Killzone's "fake motion blur" as "the worst part" of the game.[17] Even video game critics noticed that "the multiplayer [] has an odd motion blur effect that makes the game look overly blurry."[18]

---

[17]     *Killzone: Shadow Fall Multiplayer Discussion - Page 5 – NeoGAF*, http://www.neogaf.com/forum/showthread.php?t=717455&page=5 (last visited July 14, 2014).

[18]     *Killzone: Shadow Fall Review - Giant Bomb*, http://www.giantbomb.com/ reviews/killzone-shadow-fall-review/1900-605/ (last visited July 14, 2014).

42.     Suspicion as to why the Killzone's multiplayer mode was so blurry grew until the well-respected Eurogamer.net website released an article about the PS4's and the Xbox One's respective graphical resolutions. In the article, Eurogamer.net revealed that Killzone uses "upscaling" (i.e., "interpolation") to produce the game's multiplayer graphics, explaining that:

> "In the single-player mode, the game runs at full 1080p with an unlocked frame-rate … *but it's a different story altogether with multiplayer.* Here Guerrilla Games has opted for a 960x1080 [i.e., exactly half of 1080p's resolution of 1,920 by 1,080] framebuffer, in pursuit of a 60fps refresh.
>
> *                *                *
>
> [Killzone] uses a horizontal interlace, with every other column of pixels generated using a temporal upscale - in effect, information from previously rendered frames is used to plug the gaps."[19]

43.     Days after the Eurogamer.net website reported on the technical facts of Killzone, a producer for Killzone wrote:

> "In both [single player] and [multiplayer], KILLZONE SHADOW FALL outputs a full, unscaled 1080p image at up to 60 FPS. Native is often used to indicate images that are not scaled; it is native by that definition.
>
> In Multiplayer mode, however, we use a technique called 'temporal reprojection,' which combines pixels and motion vectors from multiple lower-resolution frames to reconstruct a full 1080p image. If native means that every part of the pipeline is 1080p then *this technique is not native*.
>
> *                *                *
>
> We recognize the community's degree of investment on this matter, and that the conventional terminology used before may be too vague to effectively convey what's going on under the hood. As such we will do our best to be more precise with our language in the future.
>
> *                *                *
>
> The temporal reprojection technique gave *subjectively similar results* and it makes certain parts of the rendering process faster."[20]

---

[19]     *In Theory: 1080p30 vs 720p60 - could next-gen let us choose? Eurogamer.net*, http://www.eurogamer.net/articles/digitalfoundry-2014-in-theory-1080p30-or-720p60 (last visited July 14, 2014) (emphasis added).

[20]     *See* Poria Torkan, *Regarding Killzone Shadow Fall And 1080p*, http://www.killzone.com/en_GB/blog/news/2014-03-06_regarding-killzone-shadow-fall-and-1080p.html (last visited July 14, 2014) (emphasis added).

44.     Although Sony tried to sell its "temporal reprojection" technique as a method that yields "subjectively similar" results to 1080p, it's not the same thing. By its own admission, Killzone's multiplayer mode doesn't conform to the gold-standard 1080p format that Sony advertised.

**V.     "Temporal Reprojection" is not the "Native 1080p" that Sony Promised.**

45.     Temporal reprojection is "not native" 1080p. Rather, and by Sony's account, it is just another form of interpolation. Rather than produce a single frame of 1080p (1,920 lines by 1,080 lines), Sony designed Killzone to produce a frame equal to *half* the resolution of 1080p while using information from previous frames to attempt to "reconstruct a full 1080p image." While this reconstruction technique might be novel, it is decidedly not the "native 1080p" Sony promised (i.e., where no "reconstruction" would be necessary).

46.     In truth, Sony advertised "native 1080p" multiplayer graphics, not graphics that are upscaled, interpolated, or "subjectively similar" to 1080p (not to mention blurry). Before the game's release, Sony repeatedly stated that the game's multiplayer mode ran in "native 1080p" and, following its release, indicated on the Killzone packaging's technical specifications that the game's resolution was an unqualified "1080P." Before the game's release, neither Sony nor Guerrilla qualified these representations.

47.     Worse, as of the time of this filing, Sony *still* indicates on Killzone's physical packaging (i.e., on the list of the game's technical specifications) that the game's resolution is an unqualified "1080P." Despite promising "to be more precise with [its] language," Sony has not added any disclosure to the game's packaging regarding temporal reprojection, does not mention temporal reprojection anywhere on the ShadowFall.Killzone.com website, and has not altered the game's consumer-facing technical specifications.

48.     Indeed, Sony has yet to meaningfully correct its misleading marketing for the game. On the contrary, Sony allows representations about Killzone's 1080p multiplayer graphics—and the identical claims on the game's packaging—to remain so that gamers continue to buy the game. And

as a result of Sony's actions, millions of consumers have been tricked into paying full price for a video game that doesn't deliver what is promised.

**VI. Plaintiff Ladore's Experience with Killzone: Shadow Fall.**

49.     On or about May 3, 2014, Plaintiff Ladore purchased Killzone for $49.99 from a local Best Buy.

50.     Before deciding to purchase Killzone, Plaintiff visited several websites that contained the representations disseminated by Sony—i.e., that Killzone would provide native "1080p" multiplayer graphics.

51.     Relying on those reports, Plaintiff chose to purchase the Killzone video game using Best Buy's "free store pickup" service. Thus, Plaintiff reserved a copy of Killzone on Best Buy's website and traveled to a local Best Buy store to complete his purchase.

52.     Before completing his purchase, and while still at his local Best Buy retail store, Plaintiff examined the Killzone retail packaging and confirmed that Killzone would deliver an unrestricted 1080p graphics resolution. The relevant part of that packaging was identical to that shown in Figure 1 above. Relying on that on-box representation—which echoed the reports he had read online—Plaintiff completed his purchase and took his copy of Killzone home.

53.     Plaintiff Ladore relied on Sony's on-box representation that Killzone would deliver 1080p graphics resolution. Because Plaintiff owns a television capable of rendering a 1080p resolution, Plaintiff's television was capable of rendering Killzone's graphics (in both single and multiplayer modes) at a 1080p resolution.

54.     After opening Killzone's packaging (thus rendering the game un-returnable) and playing the game, Plaintiff realized that the game's multiplayer graphics were not the "1080p" graphics that Sony advertised. Instead, Plaintiff noticed that Killzone's multiplayer graphics were blurry and did not appear to be rendering at a native 1080p resolution.

55.     Had Plaintiff known that Killzone's multiplayer mode was not running at a graphics resolution of 1080p, he would have not have purchased Killzone at all, or would have paid substantially less for it.

56. Accordingly, Plaintiff has suffered damages as the result of Defendant's misrepresentations in the form of money paid to purchase the Killzone: Shadow Fall video game.

## CLASS ALLEGATIONS

57. **Class Definition:** Plaintiff Douglas Ladore brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and a Class of similarly situated individuals defined as follows:

> All persons in the United States who purchased a copy of the Killzone: Shadow Fall video game.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

58. **Numerosity:** The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of hundreds of thousands of individuals. Class members can be easily identified through Defendant's records.

59. **Commonality and Predominance:** There are many questions of law and fact common to Plaintiff's claims and those of the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a) Whether Defendant made false statements, promises, and/or descriptions regarding the resolution capabilities of Killzone's multiplayer mode;

b) Whether Defendant made such false statements, promises, and/or descriptions to deceive consumers into purchasing its product;

c)     Whether Killzone's multiplayer mode was in fact capable of achieving the resolution advertised by Defendant;

d)     Whether Defendant's conduct described herein constitutes a violation of California's Consumers Legal Remedies Act (Cal. Civ. Code. §§ 1750, *et seq.*);

e)     Whether Defendant's conduct described herein constitutes a violation of the Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*);

f)     Whether Defendant's conduct described herein constitutes a violation of the False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*);

g)     Whether Defendant's conduct described herein constitutes fraud in the inducement;

h)     Whether Defendant's conduct described herein constitutes a breach of express warranties; and

i)     Whether Defendant has been unjustly enriched at the expense of Plaintiff and the Class.

60.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct in disseminating false advertisements and misleading marketing materials to Plaintiff and the Class.

61.    **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class, and he has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

62. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect the members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

63. **Superiority**: This class action is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

64. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Consumers Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq.***
**(On Behalf of Plaintiff and the Class)**

65. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

66. The Consumers Legal Remedies Act ("CLRA") applies to Defendant's actions and conduct as described herein because it extends to transactions that are intended to result, or which have resulted, in the sale of goods or services to consumers.

67. Defendant is a "person" as defined by Cal. Civ. Code § 1761(c).

68. Plaintiff and each member of the Class is a "consumer" as defined by Cal. Civ. Code § 1761(d).

69. The Killzone: Shadow Fall video game is a "good" within the meaning of Cal. Civ. Code § 1761(a).

70. As described herein, Defendant has engaged in deceptive practices, unlawful methods of competition, and/or unfair acts as defined by Cal. Civ. Code §§ 1750 *et seq.*, to the detriment of Plaintiff and the Class.

71. Defendant, acting with knowledge, intentionally and unlawfully brought harm upon Plaintiff and the Class by representing that the Killzone video game would be capable of providing 1080p multiplayer graphics when in fact Defendant was unwilling or unable to release a retail product consistent with those representations.

72. Specifically, Defendant violated Cal. Civ. Code § 1750 in at least the following respects:

      a. By representing that the Killzone video game had characteristics, ingredients, uses, benefits, or quantities which it did not have, in violation of § 1770(5);

      b. By representing that the Killzone video game was of a particular standard, quality, or grade of which it is not, in violation of § 1770(7); and

      c. By advertising the Killzone video game with the intent not to sell its goods as advertised, in violation of § 1770(9).

73. Defendant's unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

74. Defendant knew that it was unable or unwilling to include in Killzone the 1080p

multiplayer graphics it advertised (1) before the game's release through representations it made in its online advertising campaign and (2) after the game's release through representations it made on the game's physical packaging at the time it made those representations.

75.     Once Defendant made specific public representations regarding the inclusion of 1080p multiplayer graphics in Killzone's multiplayer mode through its online statements and through labels on the game's physical packaging, Defendant was under a duty to Plaintiff and the Class to disclose its inability or unwillingness to include 1080p multiplayer graphics in the retail version of the Killzone video game because:

a.     Defendant was in a superior position to know the true state of facts about the actual graphical resolution of the Killzone video game's multiplayer mode;

b.     Plaintiff and the Class members could not reasonably have been expected to learn or discover that Defendant was unable or unwilling to include 1080p multiplayer graphics in the Killzone video game;

c.     Defendant knew that Plaintiff and the Class members could not reasonably have been expected to learn or discover that Killzone's multiplayer mode did not in fact render the 1080p resolution advertised on the game's physical packaging; and

d.     Defendant knew, and in fact intended, that Plaintiff and Class members would rely on Defendant's public representations about Killzone's 1080p multiplayer graphics, including its online statements and the representations made on the game's physical packaging, in choosing whether or not to purchase Killzone: Shadow Fall.

76.     In failing to disclose its inability or unwillingness to include 1080p multiplayer graphics in Killzone despite representing—online and on the game's physical packaging—that the game would provide "1080P" graphics, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

77.     The facts concealed or not disclosed by Defendant to Plaintiff and the Class are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a copy of the Killzone video game, or whether to pay a discounted price for the game.

78.     Plaintiff and the Class reasonably expected their copies of Killzone to be capable of rendering 1080p multiplayer graphics based on Defendant's continuous and consistent public representations. Plaintiff and Class members' expectations were reasonable under the circumstances.

79.     The ability to render 1080p multiplayer graphics is and was a material selling point of Killzone, and, based on Defendant's marketing tactics described above, a primary reason to purchase the game.

80.     Plaintiff and Class members relied on Defendant's representations regarding the inclusion of 1080p multiplayer graphics when purchasing the video game, and in deciding not to return the game before opening its packaging (i.e., which rendered the game unreturnable).

81.     Defendant's false representations about the inclusion 1080p multiplayer graphics were acts likely to mislead Plaintiff and members of the Class acting reasonably under the circumstances.

82.     Through the misrepresentations and omissions detailed herein, Defendant wrongfully induced Plaintiff and the other members of the Class to purchase Killzone when they otherwise would not have purchased the game or would only have agreed to purchase it at a lower price.

83.     As a direct and proximate result of Defendant's violation of Cal. Civ. Code §§ 1750, *et seq.*, Plaintiff and each Class member have suffered harm in the form of paying monies to Defendant without receiving the entire benefit of his or her bargain.

84.     Under Cal. Civ. Code §§ 1780(a) and (b), Plaintiff, individually and on behalf of the Class, seeks an injunction requiring Defendant to cease and desist the illegal conduct alleged in this Complaint, and all other appropriate remedies for its violations of the CLRA. For the sake of

clarity, Plaintiff explicitly disclaims any claim for damages under the CLRA at this time.

**SECOND CAUSE OF ACTION**
**Violations of the Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff and the Class)**

85. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

86. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

87. The UCL prohibits any unlawful, unfair, or fraudulent business act or practice. A business practice need only meet one of these three criteria to be considered unfair competition. An unlawful business practice is anything that can properly be called a business practice and that is forbidden by law.

88. As described above, Defendant has violated the unlawful prong by violating the CLRA.

89. Plaintiff and the Class reasonably expected the Killzone video game to be capable of displaying 1080p multiplayer graphics based on Defendant's pre-release representations, online statements, and the representations Defendant placed on the game's packaging. Plaintiff's and Class members' expectations were reasonable under the circumstances.

90. Defendant has violated the fraudulent prong of the UCL by knowingly and willfully making false and misleading claims to the public regarding its willingness or ability to provide 1080p multiplayer graphics for Killzone by representing that the game was capable of such graphics before the game's release and on the game's physical packaging.

91. Defendant violated the unfair prong of the UCL by representing that it would provide 1080p multiplayer graphics, when in fact it was unable or unwilling to deliver such graphics.

92. Defendant's false representations—made through Defendant's online advertising

campaign and the game's packaging—regarding the capability of Killzone to render 1080p

multiplayer graphics were likely to mislead Plaintiff and Class members acting reasonably under

the circumstances, and constitute a deceptive trade practice in violation of the UCL.

93.     In failing to disclose its inability or unwillingness to provide 1080p multiplayer

graphics with Killzone, Defendant has knowingly and intentionally concealed material facts and

breached its duty not to do so.

94.     Defendant has violated the fraudulent prong of the UCL by knowingly and willingly

failing to deliver 1080p multiplayer graphics with its Killzone video game despite making pre-

release representations and online statements to that effect, and placing prominently displayed text

on the game's packaging that the game will and does include 1080p multiplayer graphics.

95.     As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent acts,

Plaintiff and each Class member has suffered injury in fact and lost money by purchasing the

Killzone video game and/or paying more than they would have if Defendant informed them that the

game was not capable of rendering 1080p multiplayer graphics.

96.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring

Defendant to cease the unfair practices described herein; (2) requiring Defendant to restore to

Plaintiff and each Class member any money acquired by means of unfair competition (restitution);

and (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

**THIRD CAUSE OF ACTION**
**Violation of False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(On Behalf of Plaintiff and the Class)**

97.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

98.     Defendant engaged in advertising and marketing to the public, and offered the

Killzone video game for sale on a nationwide basis, including in California. Defendant publicly

represented and advertised that the Killzone video game was capable of rendering 1080p

multiplayer graphics. Defendant did so with the intent to induce Plaintiff and Class members to

1    purchase the Killzone video game.

2        99.    Defendant's advertising and marketing statements were untrue and misleading and

3    likely to deceive the public in that Defendant's advertising campaign and its on-box representations

4    indicated that Killzone was capable of rendering 1080p multiplayer graphics, and Defendant knew

5    or should have known it was unwilling or unable to deliver on that promise.

6        100.    In making and disseminating the statements alleged herein, Defendant knew or

7    should have known that its statements were false and misleading and therefore in violation of Cal.

8    Bus. & Prof. Code §§ 17500, *et seq.*

9        101.    Plaintiff and members of the Class relied on Defendant's statements in deciding to

10   purchase Killzone.

11       102.    As a direct and proximate result of Defendant's false advertising, Plaintiff and the

12   Class have suffered injury in fact and lost monies to Defendant.

13       103.    Plaintiff seeks an order (1) requiring Defendant to cease the false advertising

14   practices described herein; (2) requiring Defendant to restore to Class members any money acquired

15   by means of false advertising (restitution); and, (3) awarding reasonable costs and attorneys' fees

16   pursuant to Cal. Code Civ. Proc. § 1021.5.

17   **FOURTH CAUSE OF ACTION**
     **Breach of Express Warranties**
18   **(On Behalf of Plaintiff and the Class)**

19       104.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

20       105.    Pursuant to California Commercial Code § 2313, Defendant's sale of the Killzone

21   video game included express warranties created by Defendant's affirmations of fact, made through

22   the statements made on the game's physical packaging and through Defendant's online

23   representations.

24       106.    Defendant's express warranties included affirmations of fact and promises that the

25   Killzone video game would conform to the performance capabilities represented on the game's

26   packaging and through Defendant's online representations.

27

28

107.    Specifically, and as evidenced by Defendant's pre-release representations, online marketing campaign, and as prominently displayed on the game's packaging, Defendant advertised and otherwise represented to Plaintiff and Class members that when they purchased a copy of the Killzone video game, the game would be capable of rendering 1080p multiplayer graphics.

108.    Defendant's statements were affirmations of fact or a promise made by Defendant about the Killzone game sold by or on behalf of Defendant, or otherwise constitute a description of the Killzone game. As such, Defendant expressly warranted that copies of the Killzone game, sold by or on behalf of Defendant, would include 1080p multiplayer graphics.

109.    Plaintiff and the member of the Class relied upon those affirmations, promises, and descriptions in purchasing the Killzone video game, and in deciding to open the game's packaging (after which they could no longer return the game) instead of returning it. But for Defendant's affirmations and promises, Plaintiff and the Class would not have purchased the Killzone video game, or would have only agreed to purchase it at a lower price.

110.    Defendant, under the California Commercial Code, was obligated to deliver Killzone as advertised, promised, and/or described.

111.    Defendant breached its express warranties because the Killzone video game did not conform to the specific performance capabilities advertised on the game's physical packaging and through Defendant's online representations. Defendant's failure to deliver on its promise of 1080p multiplayer graphics constitutes a breach of its express warranty to include such performance capabilities with the Killzone video game.

112.    Defendant's breach of express warranties injured Plaintiff and the Class because they purchased a product of diminished value—a video game that did not actually perform as described in Defendant's promises and representations. Because they did not receive the 1080p multiplayer graphics in their purchased copies of Killzone, Plaintiff and the members of the Class have been damaged insofar as they did not receive the benefit of their bargain.

113.    By serving this Complaint, Plaintiff and the Class hereby give Defendant notice that

1   it has breached the express warranties described above. Plaintiff and the members of the Class

2   request maximum damages under the California Commercial Code.

3                              **FIFTH CAUSE OF ACTION**
                              **Fraud in the Inducement**
4                       **(On Behalf of Plaintiff and the Class)**

5          114.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

6   herein.

7          115.    As detailed herein, Defendant misrepresented and/or failed to disclose material facts

8   regarding Killzone's ability to render 1080p multiplayer graphics.

9          116.    Through the misrepresentations and omissions detailed herein, Defendant wrongfully

10  induced Plaintiff and the other members of the Class to purchase Killzone when they otherwise

11  would not have purchased the game or would only have agreed to purchase it at a lower price.

12         117.    Defendant knew or should have known that its misstatements and omissions

13  regarding the inclusion of 1080p multiplayer graphics in Killzone were false, misleading,

14  incomplete, and deceptive, and would cause Plaintiff and Class members to purchase the Killzone

15  video game when they otherwise would not have purchased the game or would only have agreed to

16  purchase it at a lower price.

17         118.    Defendant intended that consumers rely upon the misstatements and omissions

18  detailed in this Complaint in purchasing the Killzone video game.

19         119.    Defendant knew that consumers would rely upon the misstatements and omissions

20  detailed in this Complaint in purchasing the Killzone video game.

21         120.    Plaintiff and the members of the Class relied upon those misstatements when

22  purchasing the Killzone video game, and in opening the packaging (thereby making it impossible to

23  return the video game).

24         121.    In deceiving Plaintiff and the other members of the Class into believing that Killzone

25  was capable of rendering 1080p multiplayer graphics, Defendant has engaged in fraudulent conduct

26  designed to induce consumers to purchase the Killzone video game.

27

28

122. As a proximate result of Defendant's violations of law and wrongful conduct alleged herein, Plaintiff and members of the Class have suffered damages in the form of monies paid to Defendant.

### SIXTH CAUSE OF ACTION
**Negligent Misrepresentation**
**(On Behalf of Plaintiff and the Class)**

123. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

124. Through its public statements and marketing materials, including its pre-release representations and online statements, and the prominently displayed text on the game's packaging, Defendant represented to Plaintiff and the members of the Class that Killzone would be capable of rendering 1080p multiplayer graphics.

125. Those representations were false, and at the time such false statements were made, Defendant knew or should have known of their falsity or, at the very least, Defendant acted with negligence and carelessness in ascertaining the truth of the statements. Defendant knew or should have known that Killzone was not capable of rendering 1080p multiplayer graphics. Defendant did not have any reasonable ground for believing its statements to be true.

126. Defendant intended that Plaintiff and the members of the Class rely on its misrepresentations and omissions in purchasing the Killzone video game.

127. Defendant knew that its affirmative statements about the inclusion of 1080p multiplayer graphics had been widely disseminated on video game related websites and in other publications, and further understood—and intended—that its current and future customers would see those statements.

128. Likewise, Defendant knew that its on-box representation that the Killzone video game would utilize and feature unqualified 1080p graphics—including multiplayer graphics—would be seen and relied upon by the purchasing public.

129. Defendant had a duty not to make the above-described misrepresentations, and to take steps to correct the dissemination of such misrepresentations both before the Killzone video

game was released to the public for purchase, and after Defendant acknowledged that the Killzone multiplayer did not have "native" 1080p graphics.

130.    However, Defendant did not take any steps to correct, clarify, or prevent further dissemination of its false representations about Killzone's ability to render 1080p multiplayer graphics that it had represented online and on the game's physical packaging.

131.    Plaintiff and Class members justifiably relied on Defendant's misrepresentations by purchasing the Killzone video game, and were unaware of the falsity of Defendant's statements at the time they were made.

132.    As a direct and proximate result of Defendant's misrepresentations, Plaintiff and the members of the Class suffered damages in the form of monies paid to purchase Defendant's product when they otherwise would not have purchased the game or would only have agreed to purchase it at a lower price.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

133.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

134.    Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant collected from them for the purchase of the Killzone video game, which did not perform as Defendant promised.

135.    Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

136.    Under principles of equity and good conscience, Defendant should not be permitted to retain the money obtained from Plaintiff and the Class Members, which Defendant has unjustly obtained as a result of its deceptive and misleading advertising.

137.    Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Douglas Ladore, individually and on behalf of the Class, respectfully requests that the Court enter an order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Douglas Ladore as Class Representative, and appointing his counsel as Class Counsel;

B.     Declaring that Defendant's actions, as described herein, violate the CLRA (Cal. Civ. Code §§ 1750, *et seq.*); the UCL (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); the FAL (Cal. Bus. & Prof. Code §§ 17500, *et seq.*); and constitute fraud in the inducement, breach of express warranties, negligent misrepresentation, and unjust enrichment;

C.     Award all economic, monetary, actual, consequential, statutory and compensatory damages caused by Defendant's conduct, and if the conduct is proven to be willful, award Plaintiff and the Class exemplary damages;

D.     Award injunctive relief as necessary to cease Defendant's violations of the Cal. Bus. & Prof. Code §§ 17200, *et seq.* and §§ 17500, *et seq.*, and Cal. Civ. Code §§ 1750, *et seq.*;

E.     Award Plaintiff and the Class equitable relief, including, but not limited to, restitution in the form of disgorgement of all revenue derived from sales of Killzone: Shadow Fall;

F.     Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.     Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H.     Enter such other injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

I.     Award such other and further relief as equity and justice may require.

**JURY TRIAL**

Plaintiff demands a trial by jury for all issues so triable.

Dated August 5, 2014

Respectfully Submitted,

**DOUGLAS LADORE**, individually and on behalf of a class of similarly situated individuals,

By:   /s/ Mark S. Eisen
     One of Plaintiff's Attorneys

Mark S. Eisen (SBN - 289009)
meisen@edelson.com
EDELSON PC
555 West Fifth Street, 31st Floor
Los Angeles, California 90013
Tel: 213.533.4100
Fax: 213.947.4251

Jay Edelson*
jedelson@edelson.com
Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin S. Thomassen*
bthomassen@edelson.com
Amir Missaghi*
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice* admission to be sought.

*Attorneys for Plaintiff and the Putative Class*