UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS LADORE, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SONY COMPUTER ENTERTAINMENT AMERICA, LLC,<br><br>    Defendant.<br>_____/ | No. C-14-3530 EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>**(Docket No. 30)** |

## I. INTRODUCTION

Plaintiff Douglas Ladore filed this putative class action against Defendant Sony Computer Entertainment America LLC (hereafter Sony) regarding allegedly fraudulent or misleading representations Sony made about its video game Killzone: Shadow Fall (Killzone). Specifically, Ladore claims that Sony represented that Killzone's "multiplayer" mode renders graphics in full (or "native") 1080p resolution, when in fact Killzone's multiplayer graphics are rendered with significantly less resolution than advertised.[1]

Sony moves to dismiss the complaint on a number of grounds, including that its representations about Killzone's multiplayer graphics were not false, that Plaintiff failed to adequately plead reliance on any alleged misrepresentation, that the Killzone video game is not a

---

[1] Modern video games can often be played in two separate modes, single player and multiplayer. *See* Docket No. 1 (Complaint) at ¶ 26. "Single player refers to a video game mode in which only one gamer interacts with the game at a time." *Id.* Multiplayer mode "allows gamers to play and interact with other gamers across the Internet." *Id.* at ¶ 27.

"good" so as to come under the auspices of the California Consumer Legal Remedies Act (CLRA), and that the economic loss rule bars Ladore's tort claim for negligent misrepresentation.

The substantial majority of Sony's arguments are premised on an unduly narrow reading of Plaintiff's complaint, and suffer an additional fatal flaw – to grant Sony's motion, the Court would need to draw all reasonable inferences in favor of Sony. Indeed, only one of Sony's arguments has merit: Plaintiff's negligent misrepresentation claim, as currently pleaded, is barred by the economic loss rule. Thus, Sony's motion is denied in significant part.

## II. BACKGROUND

### A. Factual Background

Defendant Sony Computer Entertainment America LLC is the American corporate entity responsible for the sale and marketing of the Sony PlayStation, a popular video game console. Complaint at ¶¶ 12-13. Sony and Microsoft, the manufacturer of the rival Xbox video game console, "have battled for video gamers' attention for more than a decade." *Id.* at ¶ 17.

On November 15, 2013, Sony launched the latest version of the PlayStation, the PS4. *Id.* at ¶ 13. The most recent version of the Xbox, the Xbox One, debuted a few days later. *Id.* at ¶ 14. Ladore alleges that "the focus of the 'console battle'" between Sony and Microsoft "rested squarely on the consoles' respective performance. Amongst gamers and video game critics, a metric known in the industry as 'resolution' is a leading indicator of video game and console performance." *Id* at ¶ 18.

"'Resolution' is a measure of a digital image's clarity." *Id*. at ¶ 19. Typically, the more pixels (point of color) that make up a digital image, the more clear that image will appear to a viewer. *See id.* According to Ladore, image "resolution" specifically "refers to the number of lines of pixels in the vertical direction [multiplied] by the number of lines of pixels in the horizontal direction (*e.g.*, 1,920 by 1,080)." *Id.* A video monitor (such as a television) that displays 1,920 lines of pixels in the vertical direction, and 1,080 lines of pixels in the horizontal direction is said to display video in "1080p" format. *See id.* at ¶ 20. A video monitor that displays only 1,280 lines of pixels in the vertical direction, and 720 lines of pixels in the horizontal direction, is said to display

2

video in "720p" format. *See id.* at ¶ 22. According to Ladore, an image displayed in 1080p will offer "double the graphical detail" as one displayed in 720p. *Id.*

For the purpose of this motion, it is important to note than an image that is originally created (or rendered) at a lower resolution, say 720p, can ultimately be displayed at a higher resolution, say 1080p. *Id.* at ¶ 23. This can be done by the process of interpolation, which is a "common name for methods that attempt to fill in blank pixels that are created when an image is transformed from a lower resolution to a higher resolution." *Id.* at ¶ 23 n. 8. Essentially, the "interpolation" process allows an image originally created with a smaller number of pixels (*e.g.*, one million pixels in a 720p image) to be displayed with more pixels (*e.g.*, two million pixels in a 1080p image) by using "algorithms to guess what the [newly created] pixels should look like by analyzing nearby pixels." *Id.* However, at least some believe that using interpolation to transform a lower resolution image into a higher resolution image is a "horrible kludge that results in soft, slightly blurry images."[2] *Id.* at ¶ 23.

A Sony subsidiary, Guerrilla Games, developed a video game title called "Killzone: Shadow Fall" that was released for sale along with the debut of the PS4. *Id.* at ¶ 13. "All marketing and advertisements for the Killzone video game were developed by Sony and emanated from Sony's California offices." *Id.* at ¶ 16. According to Ladore, that marketing focused heavily on Killzone's claimed ability to render the game in multiplayer mode at "native 1080p" resolution. *See id.* at ¶ 28. This was an important representation, for both Sony and video gamers, because the PS4 was supposed to be "more powerful in graphical terms" than the competing Xbox One, *id.* at ¶¶ 22-23, and Sony wanted Killzone to be a "showcase for the PS4's technical capabilities."[3] *Id.* at ¶ 15. Put

---

[2] Merriam-Webster defines "kludge" to mean "an awkward or inferior computer system or program that is created quickly to solve a problem," or alternatively to mean "a system and especially a computer system made up of poorly matched components." *See* http://www.merriam-webster.com/dictionary/kludge, last accessed December 15, 2014.

[3] According to Plaintiff's complaint, the Xbox One was reported to provide less resolution than the PS4, an "apparent performance shortcoming." *Id.* at ¶ 23. Plaintiff further alleges that because the Xbox One does not render graphics in 1080p, "Xbox One game developers will resort to 'interpolation, also known as 'upscaling,'" to improve the look of their games. *Id.* "Interpolation is the common name for methods that attempt to fill in blank pixels that are created when an image is transformed from a lower resolution to a higher resolution." *Id.* at ¶ 23 n. 8. Essentially, Xbox One games are rendered at a certain resolution (say 720p, with one million pixels per image) but are

3

simply, Ladore alleges that "Sony chose to feature Killzone when it launched the PlayStation 4, ostensibly because of its graphical fidelity." *Id*. at ¶ 25.

Ladore claims that he read numerous internet accounts – many of which were published by Sony or which cited statements (allegedly) made by Sony employees – that represented that Killzone's multiplayer mode would render graphics in "native 1080p and 60 fps [*i.e.*, frames per second]." *Id.* at ¶ 28. For instance, a "Killzone director" reportedly told an "official" PlayStation news site that "the first thing that people notice is fidelity . . . Killzone is running in 1080p, whereas the last game was running in 720p." *Id.* at ¶ 29 (internal modifications omitted). Another challenged representation was made a few weeks before the launch of Killzone and the PS4, when Sony released a "downloadable gameplay demonstration" of Killzone. *Id.* at ¶ 31. Describing that demonstration version of Killzone, Sony wrote on its website that "[a]s you can probably tell from the footage, Killzone Shadow Fall multiplayer outputs at a native 1080p, rendering uncapped but always targeting 60 [frames per second]." *Id.*

According to Ladore, he relied on internet reports describing Killzone's multiplayer mode as rendering graphics in "native 1080p" and thus "chose to purchase the Killzone video game using Best Buy's 'free store pickup' service." *Id.* at ¶ 51. "Before completing his purchase, and while still at his local Best Buy retail store, Plaintiff examined the Killzone retail packaging and confirmed that Killzone would deliver an unrestricted 1080p graphics resolution." *Id*. at ¶ 52. Specifically, Ladore relied on the following graphical representation on the back of the box containing the Killzone game disc:



*Id.* at ¶ 34.

---

ultimately displayed at a higher resolution (say 1080p, with two million pixels per image). The "interpolation" process allows an image originally created with only one million pixels to be displayed with two million pixels, by using "algorithms to guess what the [new] pixels should look like by analyzing nearby pixels." *Id.*

4

Convinced Killzone would "deliver 1080p graphics resolution," Ladore purchased the game and opened the package, "thus rendering the game un-returnable." *Id*. at ¶ 54. Upon playing the game, however, Ladore "realized that the game's multiplayer graphics were not the 1080p graphics that Sony had advertised." *Id.* "Instead, Plaintiff noticed that Killzone's multiplayer graphics were blurry and did not appear to be rendering at a native 1080p resolution." *Id.*

Ladore was not the only person who found Killzone's multiplayer graphics "blurry" or otherwise disappointing. *Id.* at ¶ 41. According to Ladore, even video game critics noticed that Killzone's multiplayer mode "has an odd motion blur effect that makes the game look overly blurry." *Id.* Eventually, a website called "Eurogamer.net" published an article that purported to explain why Killzone's multiplayer mode was so blurry. *Id.* at ¶ 42. Eurogamer claimed that Killzone's multiplayer mode was not rendered in native 1080p, but instead used "interpolation" to produce multiplayer graphics that appeared to have 1080p resolution. *Id.* Specifically, Eurogamer reported that in multiplayer mode, "Guerrilla Games has opted for a 960x1080 (*i.e.*, exactly half of 1080p's resolution of 1,920 by 1080) framebuffer . . . . Killzone uses a horizontal interlace, with every other column of pixels generated using a temporal upscale – in effect, information from previously rendered frames is used to plug the gaps." *Id.* (internal modifications omitted).

A few days after Eurogamer published its report that Killzone multiplayer actually used interpolation to achieve 1080p output, a "producer for Killzone" (and thus presumably a Sony employee) authored a post on "killzone.com" explaining how the game's multiplayer graphics were created. *Id.* at ¶ 43. The producer first explained that the term "[n]ative is often used to indicate images that are not scaled," and noted that Killzone' single player mode was rendered in un-scaled native 1080p. *Id.* But the producer conceded that Killzone's multiplayer mode uses a "technique called 'temporal reprojection' [(*i.e.*, interpolation)] which combines pixels and motion vectors *from multiple lower-resolution frames to reconstruct a full 1080p image*. If native means that every part of the pipeline is 1080p, *then this technique is not native*." *Id.* (emphases added). The producer then explained that "[w]e recognize the [video game] community's degree of investment on this matter, and that the conventional terminology used before may be too vague to effectively convey what's going on under the hood. As such we will do out best to be more precise with our language

5

in the future" *Id.* The producer concluded by noting that Killzone's use of interpolation "gave substantially similar results" to rendering in full/native 1080p "and it makes certain parts of the rendering process faster." *Id.*

According to Ladore, had he known that Killzone's multiplayer mode "was not running at a graphics resolution of 1080p, he would not have purchased Killzone at all, or would have paid substantially less for it." *Id.* at ¶ 55.

B. Procedural Background

Ladore filed this putative class action on August 5, 2014, on behalf of all "persons in the United States who purchased a copy of the Killzone: Shadow Fall video game." *Id.* at ¶ 57. The complaint pleads seven causes of action, including three alleged statutory violations: (1) the California Legal Remedies Act;[4] (2) the California Unfair Competition Law;[5] and (3) the California False Advertising Law.[6] *Id.* at ¶¶ 65-103. Ladore's remaining claims allege the following common law violations: (4) breach of express warranties; (5) fraud in the inducement; (6) negligent misrepresentation; and (7) unjust enrichment. *Id.* at ¶¶ 104-137. The crux of all of seven causes of action is essentially the same – Sony represented that Killzone's multiplayer mode would render graphics in 1080p, but those representations were false.

Sony filed the instant motion to dismiss on October 29, 2014. Docket No. 30 (Motion to Dismiss). Ladore filed his opposition on November 26, 2014, and Sony filed a reply on December 8, 2014. Docket Nos. 42 (Opposition) and 43 (Reply).

## III. DISCUSSION

The substantial majority of the arguments Sony raises in its motion to dismiss can be rejected for two simple reasons – either Sony's arguments ignore important factual allegations that are well-pleaded in Ladore's complaint, or Sony's arguments require this Court to construe the complaint in the light most favorable to Sony, rather than Ladore, who is entitled to the benefit of all reasonable

---

[4] Codified at Cal. Civ. Code §§ 1750, *et seq.*

[5] Codified at Cal. Bus. and Prof. Code §§ 17200, *et seq.*

[6] Codified at Cal. Bus. and Prof. Code §§ 17500, *et seq.*

inferences at this stage of the proceedings. *See Faulkner v. ADT Sec. Services, Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013). And all but one of Sony's remaining arguments are equally unavailing. Hence, Sony's motion to dismiss is denied, except with respect to Sony's challenge to Ladore's negligent misrepresentation claim.

A.      The Complaint Identifies a Misrepresentation

Sony's principal argument in support of its motion to dismiss is that Ladore failed to identify any actionable misrepresentation Sony made regarding Killzone's graphics. *See, e.g.*, Mot. to Dismiss at 1, 7. Specifically, Sony claims that it is "undisputed" that Killzone *outputs* video in 1080p in both single player and multiplayer modes, and thus its advertising was entirely truthful. This argument misses the mark because it misunderstands the gravamen of Ladore's complaint and ignores critical factual assertions made therein – assertions this Court must take as true at the motion to dismiss stage. *See Faulkner*, 706 F.3d at 1019 ("All well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party.") (citations omitted).

Sony may ultimately be correct that Killzone outputs video in 1080p even in multiplayer mode.[7] But Ladore does not allege that Sony misrepresented the final output resolution of Killzone. Rather, the heart of Ladore's complaint is that Killzone's multiplayer graphics were not originally created or rendered in 1080p – the output resolution was represented to be *native* 1080p when in fact it was not. *See, e.g.*, Complaint at ¶¶ 45-46 (alleging that "Sony designed Killzone to produce a frame equal to *half* the resolution of 1080p while using information from previous frames to attempt to reconstruct a full 1080p image. While this reconstruction technique might be novel, it is decidedly not the native 1080p Sony promised") (emphasis in the original) (internal modifications omitted). Instead, Ladore alleges that Sony relied on a technological trick to turn lower resolution

---

[7] Arguably, Killzone does not "output" video at all – the PS4 does. Ladore's allegations are about the resolution of the game play images first rendered by the Killzone game software, not the ultimate resolution displayed on his television set by the PS4. If the Killzone game software renders its multiplayer games in, *e.g.*, 720p, but the PS4 ultimately outputs the gameplay to Ladore's television at 1080p (for instance, using interpolation), that would not undercut Ladore's claims here that Sony affirmatively misled him about the ultimate quality of the graphics Killzone would provide.

graphics into graphics that, in Sony's own words, appear "subjectively similar" to native 1080p, but which by Ladore's account were "blurry" and subpar. *Id.* at ¶¶ 43, 54. Put simply, the misrepresentation occurred where Sony allegedly represented that Killzone rendered graphics in 1080p (*i.e.*, native 1080p), when in fact it renders graphics at a considerably lower resolution and then "'combines pixels and motion vectors from multiple lower-resolution frames to reconstruct a full 1080p image.'" *Id.* at ¶ 43 (quoting alleged admission of Sony employee that Killzone does not render multiplayer mode at native 1080p).

B. <u>The Complaint Adequately Alleges Reliance</u>

Sony next argues that even if Ladore's complaint adequately alleges that Sony misrepresented the true nature of Killzone's graphics rendering (which it does), liability still cannot attach because Ladore did not adequately plead reliance on any of Sony's statements that Killzone would natively *render* graphics in 1080p. Rather, Sony claims that Ladore only pleaded reliance on a single representation that appeared on Killzone's box, which stated that Killzone would *output* at 1080p,[8] but which said nothing explicit about how Killzone's graphics are rendered:



Complaint at ¶ 34; *see also* Mot. to Dismiss at 2-3, 7; Reply at 8 (claiming Ladore never alleged that he read any representations but the box label). Sony's contention is false.

After recounting the various pre-release statements made by Sony regarding Killzone's multiplayer graphics, such as a statement attributed to Sony's Social Media Manager that

---

[8] Consistent with the reasoning outlined in footnote 7, even if Ladore had simply alleged reliance on the on-box representation, this likely would have been enough to survive a motion to dismiss when drawing all reasonable inferences in Ladore's favor. Because the PS4 is capable of outputting *all* games at 1080p, a specific representation on a particular game that the output is 1080p would likely convey to the average consumer that the particular game's graphics are, in fact, natively rendered at 1080p. A completely unqualified legend, like the one at issue here, would have no real meaning if it could be applied to all PlayStation games, including the substantial majority of games that do not natively render in 1080p. *See* Complaint at ¶ 39 (alleging that Sony uses a more fulsome on-box label for games that do not natively render in 1080p).

1  "competitive multiplayer mode . . . runs at native 1080p," Complaint at ¶ 30, Ladore pleads that he
2  "visited [the] several websites that contained the representations disseminated by Sony – *i.e.*, that
3  Killzone would provide native 1080p multiplayer graphics." *Id.* at ¶ 50. Ladore then alleges that
4  "[r]elying on those reports, Plaintiff chose to purchase the Killzone video game." *Id.* at ¶ 51. That
5  is, Ladore alleges that he read the allegedly false representations Sony made on various internet
6  sites, and relied on those representations when forming his purchasing decision. Ladore then goes
7  on to state that "[b]efore completing his purchase," he "examined the Killzone retail packaging and
8  *confirmed* that Killzone would deliver an unrestricted 1080p graphics resolution" by looking at the
9  legend (reproduced above) on the box. *Id.* at ¶ 52 (emphasis added). Or, put differently, Ladore
10 alleges that he read the packaging, which corroborated (or at least did not affirmatively correct)
11 Sony's earlier misrepresentations that Killzone would render graphics in native 1080p. Based on
12 these representations, Ladore claims he purchased Killzone and played it, thereby preventing him
13 from returning the game for a refund after he learned that the graphics were not as good as promised.
14 *Id.* at ¶¶ 54-55.

15       Sony's protestations to the contrary notwithstanding, Ladore's complaint clearly asserts the
16 he relied on more than just the Killzone box label. He pleads affirmative reliance on Sony's pre-
17 release statements that Killzone would render in native 1080p. These allegations are sufficient to
18 survive Sony's motion to dismiss.

19       Sony's alternative reliance argument is equally unpersuasive. Sony argues that it disclosed
20 that Killzone actually uses interpolation (not native 1080p rendering) in multiplayer mode in at least
21 two internet posts created in March 2014, two months before Ladore actually purchased Killzone.
22 *See* Reply Brief at 9-10. Thus, Sony argues that any claimed reliance by Ladore on Sony's earlier
23 misleading statements was unreasonable as a matter of law because Sony had "come clean" about
24 the true nature of Killzone's multiplayer graphics before Ladore actually purchased the video game.
25 This argument suffers a number of flaws. Most notably, Ladore affirmatively alleges that he read
26 Sony's misrepresentations but never alleges that he read (or even became aware of) Sony's apparent
27 corrections until this lawsuit was filed. In order to credit Sony's argument, this Court would have to
28 read allegations into Ladore's pleading that are not there, and/or construe Ladore's pleading in the

9

1  light most favorable to Sony – something this Court cannot do.  Moreover, Sony's argument would
2  require the Court to accept Sony's factual claim that its corrections were in fact issued in March
3  2014, before Ladore purchased the video game.  Again, this type of fact finding – in the light most
4  favorable to the moving party, no less – is inappropriate at the motion to dismiss stage.

5  In sum, Ladore adequately alleged that Sony misrepresented the true nature of Killzone's
6  multiplayer graphics and that he reasonably relied on these misrepresentations to his detriment when
7  he purchased Killzone.

C. <u>Sony's Remaining Statutory and Contractual Arguments Are Without Merit</u>

Nearly all of Sony's arguments depend on this Court accepting that either: (1) Ladore did not plead a misrepresentation; or (2) Ladore failed to adequately plead reliance.[9]  As discussed previously, neither assertion is correct.  And Sony's remaining statutory or contract arguments that do not depend on accepting either of the above propositions are equally unavailing.

1. <u>Killzone is a "Good" Under the CLRA</u>

Sony argues that Ladore's CLRA claim (and UCL unlawful claim predicated on violation of the CLRA) must be dismissed because Killzone is not a "good," and therefore does not come within the scope of the Legal Remedies Act.  Mot. to Dismiss at 10.  Sony is mistaken.

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of *goods* or services to any consumer."  Cal. Civ. Code. § 1770(a) (emphasis added).  The CLRA defines "goods," in relevant part, as "tangible chattels bought or leased for use primarily for personal, family, or household purposes."  Cal Civ. Code § 1761(a).

Sony argues that software, software licenses and/or online [video] game features are not "goods," and therefore Ladore's CLRA claim fails.  As an initial matter, this argument ignores the critical fact that Ladore did not simply buy or download (arguably) "intangible" software, or otherwise play an online game.  Rather, Ladore went to a brick-and-mortar store (Best Buy) where

---

[9] For instance, Sony argues that Ladore's express warranty claim fails because Plaintiff does not allege that Sony expressly promised that Killzone would render (as opposed to output) graphics in 1080p.  Mot. to Dismiss at 11. Sony similarly argues that Ladore's fraud claim fails because "Plaintiff has not alleged a misrepresentation."  *Id.* at 12.

10

he paid for and received a tangible product – namely the Killzone game disc, which came in a Killzone box and was accompanied by various tangible pieces of documentation. As Judge Tigar recently explained about "Norton Antivirus" computer software, "[a] consumer can purchase Norton Antivirus in a store, pick it up in her hands, and carry it home. It is in that way the same as most commodities considered to be 'goods' under the CLRA, and distinct from the sorts of commodities that are considered not to be," such as insurance or credit contracts. *Haskins v. Symantec Corporation*, No. 13-cv-2834-JST, 2013 WL 6234610, at *9 (N.D. Cal. Dec. 2, 2013); *see also Perrine v. Sega of America, Inc.*, No. C 13-1962 JSW, 2013 WL 6328489, at *4 (denying a motion to dismiss on basis that the video game "Aliens: Colonial Marines" is not a "good" for purposes of CLRA).

Judge Tigar also correctly brushed aside Symantec's contention (parroted by Sony here) that "the fact that the software is delivered through a tangible medium is irrelevant, since the disc is nothing but a physical mechanism for delivering a nonphysical right to use intangible software." *Haskins*, 2013 WL 6234610 at *9. The court emphatically rejected the argument:

> [B]y slicing things that thinly, many of even the most tangible commodities could be characterized as delivery mechanisms for the transmission of intangible things. No one would seriously dispute that a book is a 'tangible chattel,' despite the fact that the physical object itself is merely a delivery mechanism for the transmission of information. Insurance contracts and credit cards, in contrast, are not delivery mechanisms; they are merely physical representations of the parties' intangible agreement. Consumers do not purchase software discs or books to memorialize or prove the existence of an agreement; they purchase the objects to possess and use them. As a physical object purchased for a consumer's use, a software disc is a tangible chattel.

*Id.* The court concluded that in light of the CLRA's direction that it "be liberally construed and applied to promote its underlying purposes," it could not hold that computer software, like the Killzone video game here, is not a good under the CLRA, particularly where the software is purchased in a physical medium, as opposed to downloaded from the internet.[10] *Id.* (citing Cal. Civ.

---

[10] Sony cites three cases in support of its argument that Killzone is not a tangible "good," but none are persuasive or apposite. In *McMahon v. Take-Two Interactive Software, Inc.*, No. EDCV 13-2032-VAP, 2014 WL 324008, at *10 (C.D. Cal. Jan 29, 2014), the court simply accepted Defendants' arguments that certain software and online services are not "goods" under the CLRA

11

1  Code § 1760). The same reasoning applies here. Killzone is a "good" as that term is used in the
2  CLRA.

### 2. Plaintiff Has Now Filed a CLRA Venue Statement

4  Sony also argues that Ladore's CLRA claims should be dismissed because he failed to file a
5  necessary declaration averring that this case is properly venued in this Court. Mot. to Dismiss at 10-
6  11. Ladore admits that he failed to file the necessary declaration, but notes that he has now done so.
7  *See* Docket No. 41 (CLRA Venue Affidavit). Because Sony does not challenge venue in this district
8  on the merits, or otherwise demonstrate prejudice from Ladore's failure to timely file his affidavit,
9  this Court will not dismiss Ladore's CLRA claims on this ground.

### 3. Express Warranty Not Disclaimed

11  Sony next argues that any express warranty it may have made regarding Killzone's graphical
12  performance was adequately disclaimed in Sony's Terms of Service and/or the Killzone Software
13  License. The Court cannot consider this argument at this juncture, however, because these
14  documents are not judicially noticeable, and Ladore does not mention them in his pleading or
15  otherwise incorporate them into his complaint.

16  Sony claims that these documents are judicially noticeable because they are "matters of
17  public record," but this is clearly not accurate. Ladore disputes the accuracy and authenticity of the
18  Terms of Service and Software License that Sony attached to its motion to dismiss, and Sony cannot
19  establish that these documents' "accuracy cannot reasonably be questioned." Federal Rule of
20  Evidence 201. Other courts in this district have refused to take judicial notice of software licenses

---

without analysis. The cursory treatment may have resulted because the "Plaintiffs do not directly respond to Defendants' assertions regarding the CLRA." In *In re Sony Gaming Networks & Customer Data Security Breach Litigation*, 903 F. Supp. 2d 942, 972 (S.D. Cal. 2012), the court held that an online video game *network* was not a good, and was therefore excluded from coverage from the CLRA. But this says nothing about whether a particular video game, purchased in a brick and mortar store and played from a physical disc (albeit over the internet) is a tangible good. Finally, *Ferrington v. McAfee, Inc.*, No. 10-cv-01455-LHK, 2010 WL 3910169, at *18-19 (N.D. Cal. Oct. 5, 2010), is inapposite because that case involved computer software downloaded directly from the internet, which is very different from the facts alleged here. *Id.* at *1. Indeed, for this very reason, Judge Ware refused to follow *Ferrington* in holding that the purchaser of a video game had stated a claim under the CLRA. *See Perrine*, 2013 WL 6328489, at *4 (refusing to apply *Ferrington* and denying a motion to dismiss on ground that a video game is not a "good" for purposes of CLRA).

or terms of service, particularly where those documents' accuracy is in dispute. *See, e.g.*, *Ferrington*, 2010 WL 3910169 at *4 (refusing to take judicial notice of software license agreement at motion to dismiss stage because "there is no basis to conclude that these documents are accurate"). Because the accuracy of the relevant documents is in dispute, the Court will not consider whether Sony may have effectively disclaimed any express warranties in its Terms of Service or Software License.

D.     The Economic Loss Rule Bars Plaintiffs' Negligent Misrepresentation Claim As It Is Currently Pleaded

Sony finally argues that Ladore's negligent misrepresentation claim must be dismissed pursuant to the "economic loss" rule because Ladore only claims that he suffered economic (*i.e.*, contractual) damages. Sony is correct.

As this Court recently explained, the "economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Tasion Communications v. Ubiquiti Networks, Inc.*, No., C-13-1803 EMC, 2013 WL 4530470, at *3 (citations omitted). Thus, the "economic loss rule has been applied to bar a plaintiff's tort recovery of economic damages unless such damages are accompanied by some form of *physical* harm (i.e., personal injury or property damage)." *North American Chemical Co. v. Superior Court*, 59 Cal. App. 4th 764, 777 (Cal. 1997) (emphasis in original). Put more precisely, "in actions arising from the sale or purchase of a defective product, plaintiffs seeking economic losses must be able to demonstrate that either physical damage to property (other than the defective product itself) or personal injury accompanied such losses; if they cannot, then they would be precluded from any tort recovery in strict liability or negligence." *Id.* at 780.

Ladore acknowledges that the economic loss rule may eventually apply to his claims, but responds that the rule should not bar his negligent misrepresentation claim at the pleading stage because he is entitled to plead alternative theories of recovery – according to Ladore, the economic loss rule would only potentially come into play in this case when "an occasion for election of remedies arises." Reply at 24-25 (quoting *North American Chemical*, 59 Cal. App. 4th at 774).

Ladore is mistaken. If, as *North American Chemical* holds, Ladore will *never* be permitted to recover in tort for any economic damages suffered as a result of his purchase of Killzone, then he has not pleaded a legally viable cause of action even at the pleading stage, and his claim must be dismissed. *North American Chemical*, 59 Cal. App. 4th at 780 (stating the rule that in "actions arising from the sale or purchase of a defective product," a plaintiff simply cannot recover his purely economic losses in tort). Or, put differently, *North American Chemical* and similar cases hold that non-economic loss is a required element of a negligence cause of action alleged in a sale of goods case, and thus non-economic loss must be pleaded to survive a motion to dismiss.

Ladore correctly notes that in *North American Chemical*, the Court of Appeal concluded that the Plaintiff's negligence cause of action was *not* barred by the economic loss rule at the pleading stage. But Ladore fails to recognize that this was because *North American Chemical* concluded that the economic loss rule does not necessarily apply in cases arising out of "a contract for the performance of services rather than the sale of goods." *Id.* at 770. Indeed, the *North American Chemical* court was careful to point out that it reached its holding only because the relevant contract in that case was a service contract. *Id.* (explaining that "because this case arises from a contract for the performance of services *rather than the sale of goods*, . . . the so called 'economic loss rule' does not bar recovery even though [] the only damages that North American seeks are based solely on economic loss") (emphasis added). As the Court of Appeal explained, a "contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner. A negligent failure to do so may be both a breach of contract and a tort. In such a hybrid circumstance, the plaintiff is entitled to pursue both legal theories until an occasion for an election of remedies arises. " *Id.* at 774. But this is not the case where the underlying transaction involves the sale of goods. *See id.*; *see also City and County of San Francisco v. Cambridge Integrated Services Group, Inc.*, No. C 04-1523 VRW, 2007 WL 1970092, at * 2 (N.D. Cal. July 2, 2007) (following *North American Chemical*, where "the court distinguished cases involving defective products, for which the economic loss rule applies, and those involving defective services, for which the economic loss rule does not apply," and holding that economic loss rule did not

warrant dismissal at pleading stage of a negligence claim related to performance of a professional services contract).

In sum, Plaintiff's negligent misrepresentation claim is not adequately pleaded because Ladore has alleged no non-economic losses suffered as a result of his purchase of Killzone. The Court will, however, grant Ladore leave to amend his negligent misrepresentation cause of action in case Ladore could sufficiently allege that he or other putative class members suffered such non-economic damages. *See* Fed. R. Civ. Pro. 15(a)(2) (requiring that the Court "freely give" leave to amend when "justice so requires").

## IV. CONCLUSION

Sony's motion to dismiss Ladore's negligent misrepresentation claim is granted. Ladore shall have thirty (30) days to file an amended complaint. The remainder of Sony's motion to dismiss is denied.

This order disposes of Docket No. 30.

IT IS SO ORDERED.

Dated: December 16, 2014

_____
EDWARD M. CHEN
United States District Judge